Please the court. My name is Vicki Dobrin and I represent Mr. Haidery, the petitioner. There are four issues before the court today. The first is whether the board's negative credibility determination is supported by substantial evidence. The second is whether the board acted irrationally and arbitrarily in upholding the IJ's negative credibility finding when it had previously rejected that exact same finding. The third is whether the regulations and if so, what the remedy should be. And finally, whether substantial evidence supported the denial of cat relief. Turning to the first issue, I want to just emphasize that the court's review is limited to reviewing the board's decision. The board conducted an independent review of the record, provided its own reasoning, and didn't just adopt the IJ with regard to credibility. And in doing so, it relied on just one reason to find Mr. Haidery not credible. And that was the discrepancy or alleged discrepancy regarding how frequently he attended church with his ex-wife. She testified that they went, she could only recall going two times during their three-month marriage and he testified that they went on a weekly basis. Assuming there's an inconsistency there, we believe it's incredibly minor under this court's jurisprudence. It doesn't go to the heart of the claim. And beyond that, it's offset by all of the other evidence that Mr. Haidery did present to establish that he is, indeed, a convert to Catholicism and continues to adhere to the Catholic faith. Didn't she? So given Excuse me. Didn't the ex-wife also testify that he used a false name? She did, but the board didn't rely on that in its decision. And so, oh, sorry. And that he had to ask her outside the hearing room where they went to church? She did testify to that. She testified that he asked her if she remembered the name of the church they went to. But again, if the board had relied on those reasons, the court could consider them. But because it did not, we believe that under Chenery, those are not before the court. And the review is limited to that one reason. Obviously, the board could have done a better job. It's had three opportunities in this case to address credibility. And so, in reviewing that one reason, the court should conclude that substantial evidence does not support that negative credibility determination. And then, because the board found the credibility issue dispositive of the entire withholding of removal claim, the court would have to remand under Ventura to afford the agency the opportunity to address whether he had otherwise met his burden of establishing eligibility. Well, I guess the question I have on that is if we agreed with you on the credibility, but then you go to the CAT analysis. Since the board seemed to adopt the IJ's analysis on CAT and the IJ listed off a number of other things like unlikely association with communists, the country report, lack of political activity, is that an alternate holding, in effect, that's credibility? Yes, Your Honor. That's exactly right. And so, with regard to CAT review, the court can reach that issue. With regard to the statutory withholding of removal claim, whether it's more likely than not that he would face threats to his life or freedom, that is not before the court, or that review is not before the court, because the agency didn't address that. But CAT is before the court, and we believe that substantial evidence does not support the denial of CAT relief. The immigration judge, as the court pointed out, relied, in part, on the negative credibility determination, but also on an inaccurate summary of the country report and the evidence of record. So what would need to be remanded, in your view, just so I get that straight? Oh, just the analysis of country conditions with regard to withholding of removal, statutory withholding of removal, not withholding of removal under CAT, because in the board's decision it said that because it found credibility dispositive as to the asylum and withholding aspect of the claim, that it wasn't going to reach the other issues. So that aspect should be remanded. And with regard to CAT relief, there were two experts that testified in this case, and the immigration judge, without any basis, just stated that he disagreed with them, but didn't provide any reasoning to disagree with both of their conclusions, that as an apostate alone, it's more likely than not that Mr. Hyderi would be sentenced to death in Afghanistan. And the immigration judge acknowledged that even the State Department pointed out that apostasy is punishable by death, but provided no basis for rejecting the expert's testimony on that point. So we believe that financial evidence cannot support the denial of CAT relief on the basis of his apostasy alone. But obviously there were other factors that he presented in support of his CAT claim, and Mr. Sifton, the first expert, testified regarding why those factors also made it more likely than not that he could meet his burden under CAT. And there's no evidence to contradict that in the record. I just wanted to quickly address two other issues that the Court could address if it was not inclined to reverse the credibility determination, or if it found that substantial evidence did support the Board's credibility finding. And those are the arbitrariness of the Board's decision-making in this case, and the confidentiality issue. And again, those only need to be addressed if the Court is not convinced that the credibility determination should be reversed. And with regard to the arbitrariness, we argued to the immigration judge and to the Board that the I.J. was precluded from finding Mr. Hyderi not credible based on the exact same reasoning that the Board rejected after this Court and this panel remanded the case to the Board with specific instructions that it addressed the credibility determination. And it did that, and it rejected it. And the immigration judge on remand just ignored that entirely and then went on to rely on the exact same factors that he did in his initial decision. And the Board upheld that and said, well, no, it was a new finding, was based on new testimony. And so that was clearly an arbitrary decision on the part of the Board, which would provide an additional reason to reverse the credibility finding. And the other issue that the Court may or may not need to reach is the confidentiality issue. The government has not argued and has presented no evidence that it obtained a written waiver from Mr. Hyderi to disclose the information that it did to his ex-wife. And by regulation, that was a violation. It was a clear violation. There are no implicit waivers. And beyond that, the Board didn't state one way or another whether it agreed or not with us as to the violation. But what it did say was that regardless that the regulation doesn't require or permit the striking of testimony that's obtained as a result. You're down to about a minute and 15 seconds. Would you like to save some time? Sure. Go ahead and finish up your sentence. The only thing I wanted to say was that given the violation, given the interests that are protected by that regulation, we believe that the limited remedy of striking her testimony would be appropriate in this case. And I'll reserve the rest of my time. You have about a minute. Thank you for your argument. We'll hear from the Attorney General at this time. Good morning. May it please the Court. My name is James Grimes, and I'm here on behalf of the Attorney General. Although there are subsidiary issues before the Court, I believe the primary issue is the question of credibility, and thus the question before the Court is whether or not the record compels the conclusion that the petitioner is credible. Ms. Dobryn, can you hear counsel all right? I can, thank you. Okay. Please let us know if you can't. See me? Okay. I just wrote that. Okay. All right. You'll have to speak up a little bit, though. I'm sorry, Your Honor. I'll try. I'll endeavor to do that. The primary focus of the petitioner's claim was his assertion that he had converted to Catholicism, and he attempted to demonstrate that as a factual matter through his testimony and other evidence. His testimony, however, was in conflict with the testimony of his wife, his former wife, Ms. Beaton. And the petitioner's version of events. He, as Petitioner's counsel has explained, had testified that they attended church together almost every week or frequently, and she testified that they only went twice. Why does that matter? Well, it wouldn't — it doesn't matter in general whether a Catholic, whether a person who claims to be Catholic goes to church a lot. The question is, what was the evidence that he presented in order to try and meet his burden? And in trying to meet his burden, he said, well, we went to church very frequently. And so that was his testimony. Her testimony was in conflict. And if you credit her testimony over his, then he wasn't telling the truth about that on a material point. And this is what bothers me about the case. I think they could have — the IJ could have chosen to discredit his testimony on a number of grounds. But nobody seems to argue that he's not a Catholic except the IJ. She says, we went to church. His priest says, he was a convert. He says, I went to church frequently, and he may have exaggerated that. I'll accept your position on that. But persecution doesn't occur because someone is more or less devout or the number of times they go to church. It's whether you belong to that particular faith or not. So that's my question is, why does this inconsistency about frequency? Let's assume you're entirely correct that he was exaggerating his devotion to the church. He was exaggerating the number of times he went to church. But nobody seems to argue that he didn't go to church at all or was not a Catholic. The point is — I guess the question would be whether a person can bear their burden by presenting testimony that the prior fact finds to be false. And our position is that if that happens, that he cannot bear his burden because the testimony he's presented is false. He also said that he read to Miss Beaton's daughter and taught her what he knew about Catholicism and Christianity. Let's assume that's all true. But the question is, is he Catholic or not? Is there any dispute on the record that he's not a Catholic? Well, this is how he tried to prove that he is Catholic. The testimony he presented in support of his claim that he's Catholic, the prior fact found to be false. I understand your position, but is there really any doubt in the record that he's Catholic? I think his priest testified he had a conversion. She said he went to church. I mean, there's no doubt he went to church, Catholic church. You did go to — there's no doubt that he went to Catholic church? I don't want to — go ahead. I'm sorry. No, no. I didn't mean to cut you off. There's no doubt that he went to church twice, that he — after he was in prison and facing removal, that he was going — went to services at the detention center. And as the immigration judge says, well, that's — that doesn't mean as much when you're actually facing, you know, removal or — that doesn't necessarily demonstrate that that's what happened. He could have just done that because that's what — how he tried to present his claim. And I think that's what the immigration judge was focused on. So — and that's really the point, is that he — is his testimony — that he cannot carry his burden by presenting testimony that's in conflict with other testimony when the prior fact credits the other person. The government is not saying that you have to go to church in order to demonstrate that you've converted to Catholicism. The issue is just whether or not his testimony was found to be false and whether there is evidence in the record to support that determination. I think the problem I have is probably a little slightly different, which is there has to be a specific and cogent reason that goes to the heart of the claim. And the quarrel is, was he going to church frequently? Was he exaggerating the amount of his faith? But I don't think anybody quarreled that — said he wasn't a Catholic on this record. Do you disagree with that? I would disagree with that. I think that was what the immigration judge found, that there was a quarrel on that point, that the evidence that he attempted to present to support his — his claim that he was Catholic was false in some respects. And as this Court has said, I believe, in Lopez and Mazur, that is a — that is a valid reason to doubt the person's credibility. I agree with you in a certain sense. If — if the I.J. had said, I don't think he's going to practice his faith openly if he returns to Afghanistan, and therefore he has no reason to fear, I could understand that. But I know I've asked this before, but is there anything on the record, did anybody testify, no, he's not Catholic? I don't — I mean, the evidence as to whether he's Catholic was from his priest, and the immigration judge discounted that, and that was his own testimony, if I remember correctly. And she said he was Catholic. They just didn't go to church. So there's really no dispute on that point, is there? And if I miss it, I — Well, I would — I would disagree. I think that his testimony was found to be false, and therefore he was unable to carry his burden of showing that he was devout Catholic, which is what his claim was. And I — You added the word devout, and that doesn't necessarily — Well, I'm sorry, it doesn't matter what devout or whatever. I believe that's what — the immigration judge used that — used that word a number of times since I was thinking of that. But — and I would — I would like to make another — a point as to what exactly is before the Court and what is not before the Court. This was a single-member affirmance, not an affirmance without opinion, not a three-member decision. It was an affirmance under the regulation at — at ACFR 1003.1, subparagraph E5. And the Attorney General has — has explained that when there's an affirmance on that ground that the reviewing court can look at both the immigration judge's and the board's determination to find out what the — what is actually before — what the agency's decision is. And so I — we believe that just those factors we've already addressed are — are sufficient. But there were other factors the immigration judge looked to. On page 112, he pointed out the fact that — that Mr. Hadiri had — had several fraud convictions, and that cuts against his credibility. As — as has been remarked upon, he — he — he relied on the fact that their marriage was annulled due to his fraud. So there were other factors that the immigration judge relied upon. And I think the Petitioner is — is asserting that he's credible and that the Court should ignore all the evidence in the record that demonstrates that he's not credible. He's been convicted of fraud in three countries, by my count. He's used multiple aliases. He — he — by — if you credit her testimony, he never told her what her real name was, and she didn't find out what his real name was until after he absconded on charges that he beat someone else. What was — what did the I.J. do with the priest's testimony? With the priest's testimony, I believe that he — and I'm — and I'm sorry, I can't remember the exact page in the record where he — where he talked about this, but I believe what he did with the priest's testimony was he discounted that because that testimony reflected his behavior after he was subject to removal and after he'd been placed in prison. And so he — he found that that might not be as reflective of how he really believed — how his real, genuine feelings, as might otherwise be the case when he wasn't concerned with removal. Now, I see my time is short, and I'd like to, if I — unless there are other questions on that point, get to the res judicata issue and the confidentiality issue. My question on confidentiality is, what is the remedy for the service's breach of the regulation? Well, I think, and that's — that's a question that I've pondered, what you would do. The exclusionary rule wouldn't apply for the reasons we've discussed. So he would have to show, first, that there was a breach, which we don't concede, but assuming that there was a breach, he would have to show that there — an interest of his that's protected by the regulation was — was prejudiced. And I'll, of course, concede that an asylum applicant has an interest in not having his persecutors or his government find out about the fact of his application. But there isn't any evidence in — in this case that that is — that has happened. I think in the — in the Lynn case that — that Petitioners relied on, the court — you had an instance where the government actually found out about that. And I think the court there analyzed that as sort of, this is a whole new basis for a claim, sort of a state-created danger sort of analysis. But — so — so that would be a situation where you — where you might have a problem that you would — that the court would have to consider. But here, there is no evidence that an interest that he has that is protected by the regulation has been prejudiced. He doesn't have an interest in — But — but if there is, what's the remedy? I guess that's — that's the — That's really the question. I mean, if we — if we agree that there's no exclusionary rule application, and if we were to assume there was a violation, it leaves you with not a lot of comfort on that point. So why have the regulation almost? I mean, is there disciplinary action to the employee? Does he have a private right of action under civil rights laws? I mean, what's the — what's the position of your client on that? I'm sorry. I didn't mean to interrupt. What's your client's position? In Lynn, I — I can't speak specifically to that. What would happen? I know that in Lynn, the court talked about it. There was — there was a disciplinary action. Whether there would be a private right of action, I don't know. I can only answer as to — I can answer in two ways. He might have a — he might have a new claim for asylum, and he might — well, that's about — I think that's about as far as we could go. He might have a claim for that. He can't have it. But if we say there's no remedy by means of the exclusionary rule, it basically says to the government, you can go ahead and violate it all you want, and — in terms of trying to prejudice witnesses, and there's — there's no harm to that. That's hard to count. Yes, and I understand. That's not really very palatable to suggest that the government can just go ahead and do that. I think there would have to be some sort of remedy. So what is it? So that's why — I'm not — I'm not sure what that remedy would be in a case where you can show. What happened in Lynn was the court remanded and said consider the asylum application based upon this possibility that there was — this problem created. We don't have that in this case, however. There's no evidence that anyone knows about his asylum application. My time has expired. I would like to suggest that there was no final judgment on the credibility issue as to ratio decada. The only final judgment was that finding that an alien was — has suffered a number of convictions doesn't matter as to whether or not he's actually a Catholic. And that's — that is the only final judgment that was reached. Any that, we would ask that you deny the petition for review. Thank you for your argument. Thank you, Your Honor. Rebuttal, Ms. Dobry? Thank you. I think — just a couple of points. The government has mistaken that the court can review the IJ's decision. This court's case law is very clear that where the board does not adopt but provides its own analysis, that review is limited to the board's reasoning. And I think if the court reviews the board's decision, it's very clear that it reached its own conclusion and came up with a single reason to support the negative credibility determination. That's the only reason before the court. And with regard to the confidentiality issue, the government argues that the violation here is different than what occurred in the Seventh Circuit case. And although the disclosure here was made to an individual in the United States, the regulation and the memo that is in the record, the CIS memo on the issue, makes clear that the disclosure cannot be made to any third party. And they have — that's there for a reason. And part of it is because there's no way to know whether or not a third party in the United States would have a reason to disclose the contents of the application to the African country. We will never know in this particular case whether that occurred. Obviously, there's no evidence to that effect in the record, but it's certainly possible that Ms. Beaton, who has an ax to grind with Mr. Hydery, would disclose that information. And we can't really — I mean, it's very speculative, but the point is the regulation is to protect the confidentiality of an applicant. And as the court has indicated, a remedy should exist for that. And because it's impossible for us to prove whether or not this prejudiced him with regard to his asylum or his withholding claim, that's really not the point. I think given the violation and given the interests that are at stake, the limited remedy that we're asking for is entirely reasonable. And I think — I think you're over your time. Thank you both for your arguments. The case just argued will be submitted for decision, and the Court will stand adjourned.
judges: Hawkins, Thomas, McKeown